**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LUIS L. ARMENTERO,
       *Petitioner-Appellant,*

v.

IMMIGRATION AND NATURALIZATION
SERVICE,
       *Respondent-Appellee.*

No. 02-55368

D.C. No.
CV-01-08658-TJH

ORDER

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, District Judge, Presiding

Argued and Submitted
October 7, 2004—Pasadena, California

Filed June 21, 2005

Before: Thomas J. Meskill,* Warren J. Ferguson, and
Marsha S. Berzon, Circuit Judges.

Order;
Concurrence by Judge Ferguson;
Dissent by Judge Berzon

---

**COUNSEL**

Marc Van Der Hout and Megan Ferstenfeld-Torres, Van Der
Hout, Brigagliano & Nightingale, LLP, San Francisco, Cali-
fornia; Trina A. Realmuto, American Immigration Law Foun-

---

*The Honorable Thomas J. Meskill, Senior United States Circuit Judge
for the Second Circuit, sitting by designation.

dation, Washington, D.C.; and Michael Tanaka, Deputy Federal Public Defender, Los Angeles, California, for the petitioner-appellant.

David J. Kline and Michelle E. Gorden, Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent-appellee.

---

### ORDER

As the Petitioner-Appellant is now a fugitive from custody, the "fugitive disentitlement" doctrine precludes him from pursuing this appeal. *See Degen v. United States*, 517 U.S. 820 (1996); *Antonio-Martinez v. INS*, 317 F.3d 1089 (9th Cir. 2002). Accordingly, the appeal is DISMISSED.

IT IS SO ORDERED.

---

FERGUSON, Circuit Judge, concurring specially:

I concur in the order to dismiss this matter on the basis of the fugitive disentitlement doctrine. I write separately, however, to express my concern over the increasing assumption of power by U.S. administrative officials to decide matters vested by our constitution to the judiciary. Administrative agents cannot be vested with the authority to render decisions concerning the length of detention. Such decision-making power rests in the hands of a judicial officer.

8 U.S.C. § 1231(a)(6) provides in relevant part: "An alien ordered removed who is inadmissible under . . . section 1182 of this title . . . may be detained beyond the removal period." 8 C.F.R. §§ 212.12-13 (the "Cuban Review Plan"), adopted in 1987, confer special administrative authority to a Cuban

Review Panel to determine a Mariel Cuban detainee's suitability for parole. The Panel consists of two or three persons selected from the staff of the Bureau of Immigration and Customs Enforcement (BICE), a division of the Department of Homeland Security. *See* 8 C.F.R. § 212.12(c). A Mariel Cuban detainee may be released on parole only "for emergent reasons or for reasons deemed strictly in the public interest." 8 C.F.R. § 212.12(b)(1). The ultimate decision to release a Mariel Cuban detainee is made by the Associate Commissioner for Enforcement, a single administrative official. *See* 8 C.F.R. § 212.12(d)(2).

This statutory and administrative arrangement affords the Attorney General (now the Secretary of Homeland Security), Cuban Review Panelists, and the Associate Commissioner for Enforcement the authority to determine whether and for how long an excludable Cuban national may be detained. But this authority has been seriously limited. In *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001), the Supreme Court interpreted 8 U.S.C. § 1231(a)(6) as authorizing the Attorney General to detain admissible aliens only so long as "reasonably necessary" to remove them from the country. "[O]nce removal is no longer reasonably foreseeable," the Court held, "continued detention is no longer authorized." *Id.* at 699. The presumptive period during which the detention of an alien is reasonably necessary is six months. *Id.* at 701. In *Clark v. Martinez*, 125 S. Ct. 716, 722 (2005), the Supreme Court extended *Zadvydas* to apply to excludable (and inadmissible) aliens as well.

*Zadvydas* and *Martinez*, therefore, invite doubt as to the constitutionality of the current Cuban Review Plan. "The Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 (citations omitted). "[T]he Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.' " *Id.* at 692 (quoting *Superintendent, Mass. Corr. Inst.*

*at Walpole v. Hill*, 472 U.S. 445, 450 (1985)). I, therefore, take issue with the authority of a Cuban Review Panel to render judicial determinations concerning excludable aliens' length of detention.

In Armentero's case, a Cuban Review Panel reviewed his case seven times in the span of nearly a decade, and six of those times the Panel denied him parole and recommended his continued detention. To this date, notwithstanding the lower federal courts' review of his current habeas petition, no judicial officer has reviewed whether Armentero should remain detained. A single ad hoc administrative panel — indeed, a single administrator alone — should not assume the distinctly judicial role of determining matters of fundamental constitutional importance. The Internal Revenue Service does not decide how long to detain tax evaders; neither should a Cuban Review Panel decide how long to detain excludable aliens.

---

BERZON, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to dismiss this case on the basis of the "fugitive disentitlement" doctrine. Several considerations counsel against resort to such a sanction on the facts of this case. Instead, I would again reach the merits of the question decided by this panel in its initial decision — who is the proper respondent for habeas petitions filed by immigration detainees? *See Armentero v. INS*, 340 F.3d 1058 (9th Cir. 2003) (*Armentero I*), *withdrawn*, 382 F.3d 1153 (9th Cir. 2004) (order).

As I suggest below, our original opinion, when clarified and considered in light of the government's litigation stance, is consistent with the Supreme Court's decision in *Rumsfeld v. Padilla*, 124 S. Ct. 2711 (2004). *Padilla* expressly *reserved* the question decided by this panel in *Armentero I. See id.* at 2718 n.8. I am therefore convinced that, as in *Armentero I*, we

should remand to the district court to allow Armentero to amend his habeas petition to name a proper respondent, who need *not* be the "Field Office Director."

As I read *Padilla*, it did not entirely abandon the Supreme Court's earlier admonition that "we have consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements." *Hensley v. Municipal Court*, 411 U.S. 345, 350 (1973). In the special circumstances of immigration habeas petitions like Armentero's, the procedural rule for which the government argues would indeed "suffocate the writ," as I proceed to demonstrate after some important preliminaries.

Consequently, although two intervening legal developments have made this conclusion considerably less significant going forward than it was at the time we agreed to rehear this case,[1] I would essentially reaffirm our original holding in *Armentero I*. Because the majority instead dismisses this appeal on the basis of a discretionary equitable doctrine not applicable here, I respectfully dissent.

## I.   Background

As we summarized in *Armentero I*,

Luis Armentero, a native and citizen of Cuba,

---

[1]The first relevant post-*Padilla* development is the Supreme Court's January 2005 decision in *Clark v. Martinez*, 125 S. Ct. 716 (2005), which, in addition to foreordaining the merits of Armentero's petition, will likely cause a significant decrease in the number of aliens detained along the lines at issue here. The second development is the passage, on May 11, 2005, of the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, which purports to do away with all immigration habeas petitions arising out of removal orders. Although, in light of these two developments, immigration habeas petitions may become a vestigial form of relief, we must still resolve the case before us.

arrived at Key West, Florida as part of the Mariel Boatlift. He was paroled into the United States pursuant to INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). During his first five years in the United States, Armentero amassed a record of arrests, convictions, and brief jail stints, mostly for petty offenses. Then, on June 24, 1985, Armentero was convicted of violating § 261.2 of the California Penal Code, Rape by Force, and sentenced to three years in prison. An Immigration Judge found Armentero excludable from the United States and ordered him deported. This order was not appealed and became final in November 1987.

The INS was apparently unable to deport Armentero. In the ensuing years, Armentero was released to a halfway house; detained once again by the INS after a new conviction; paroled again; convicted of yet another crime; and detained once more by the INS.

On October 5, 2001, while detained at the INS processing center in San Pedro, California, Armentero filed a pro se habeas petition in the United States District Court for the Central District of California, claiming that he was being indefinitely detained in violation of the Due Process clause of the Fifth Amendment and that the conditions of his detention amounted to punishment imposed in violation of the Constitution. The INS later transferred Armentero from the San Pedro facility to the federal penitentiary at Terre Haute, Indiana, for continued detention.

The district court denied Armentero's petition without prejudice on January 25, 2002. Armentero then appealed to this court.

*Armentero I*, 340 F.3d at 1060 (footnote omitted). In *Armentero I*, we held that, by naming the INS[2] as the respondent to his habeas petition, Armentero had failed to name a proper respondent. The proper respondents, we held, are the Attorney General and the Secretary of Homeland Security. Rejecting the INS's argument based on the so-called "immediate custodian" rule, we concluded:

> Neither Supreme Court law nor our own precedent requires that an immigration detainee name her immediate physical custodian as respondent in a habeas action. Accounting for the considerable practical problems with adhering to an immediate custodian rule in the immigration context and the changes resulting from the recent overhaul of the agencies enforcing our nation's immigration laws, we hold that the appropriate respondents to immigration detainees' petitions are the DHS Secretary and the Attorney General. We therefore remand to the district court with instructions that it grant Armentero a reasonable period of time in which to amend his petition to add the proper respondents.

*Id.* at 1074.[3] Although the panel did not know it — nor, apparently, did counsel for the parties — by the time the *Armentero*

---

[2]The INS was abolished on March 1, 2003, and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205. We refer to the agency as the INS where the relevant proceedings took place before the transfer. *See Minasyan v. Gonzales*, 401 F.3d 1069, 1072 n.4 (9th Cir. 2005). Otherwise, we refer to the respondent as "the government" or "BICE" — the "Bureau of Immigration and Customs Enforcement."

[3]Importantly, as I note below, the government was not arguing in *Armentero I* for the "immediate" custodian, that is, the warden or supervisor of the institution in which Armentero was imprisoned. Rather, its argument was that the proper respondent should be the local District Director — the "Field Office Director" in present-day terminology. *See* 8 C.F.R. § 1.1(o) (2005).

*I* decision was filed on August 18, 2003, Armentero had absconded from the halfway house into which he had been paroled on August 7, 2003.

Another significant intervening development was the Supreme Court's *Padilla* decision, handed down on June 28, 2004. The merits of *Padilla* concern the President's authority to detain U.S. citizens captured within the United States as "enemy combatants." *See, e.g.*, *Padilla v. Hanft*, No. 04-2221, 2005 WL 465691 (D.S.C. Feb. 28, 2005). *Padilla* also raised complicated jurisdictional questions: Although Padilla was detained at a South Carolina navy brig, he named Secretary of Defense Rumsfeld, in addition to the brig commandant, as a respondent, and filed his petition in the U.S. District Court for the Southern District of New York. The pivotal jurisdictional questions in the Supreme Court were whether Rumsfeld was a proper respondent, and, if not, whether venue in New York was nonetheless appropriate.

Initially, the district court in *Padilla* had concluded that, because Padilla's case was unusual, at least as compared to most federal habeas petitions,[4] it was appropriate to adopt a more flexible approach to the determination of the proper respondent than in the usual detention case. As the court in *Padilla* recognized, in the "usual" circumstance, a petitioner is raising a collateral challenge to a criminal sentence, so the

---

[4]As the district court observed,

> what makes the usual case usual is that the petitioner is serving a sentence, and the list of those other than the warden who are responsible for his confinement includes only people who have played particular and discrete roles in confining him, notably the prosecuting attorney and the sentencing judge, and who no longer have a substantial and ongoing role in his continued confinement. The warden becomes the respondent of choice almost by default. As discussed below, this is not the usual case.

*Padilla ex rel. Newman v. Rumsfeld*, 233 F. Supp. 2d 564, 579 (S.D.N.Y. 2002).

immediate custodian — ordinarily the warden of the prison —
is the only individual exercising direct legal authority over the
petitioner. *See Padilla ex rel. Newman v. Rumsfeld*, 233 F.
Supp. 2d 564, 579-83 (S.D.N.Y. 2002). The Second Circuit,
although divided on the merits, affirmed the district court's
jurisdictional analysis in full, *see Padilla v. Rumsfeld*, 352
F.3d 695, 704-08 (2d Cir. 2003); *see also id.* at 726 (Wesley,
J., concurring in part and dissenting in part), finding support
for its position in *Armentero I*, *see id.* at 706 n.13.

The Supreme Court reversed the Second Circuit's jurisdic-
tional holding, concluding that Padilla's petition was a "core
challenge"[5] — a challenge to "present physical confinement."
In such cases, the Court held, the immediate custodian rule
should generally apply:

> In accord with the statutory language and *Wales'*
> [*v. Whitney*, 114 U.S. 564 (1885)] immediate custo-
> dian rule, longstanding practice confirms that in
> habeas challenges to present physical confinement
> — "core challenges" — the default rule is that the
> proper respondent is the warden of the facility where
> the prisoner is being held, not the Attorney General
> or some other remote supervisory official. No excep-
> tions to this rule, either recognized or proposed,
> apply here.

*See Padilla*, 124 S. Ct. at 2718 (citations and footnotes omit-
ted).[6]

---

[5]Although no source is cited in *Padilla* for the etymology of the term,
the concept of a "core challenge" may have its roots in the Supreme
Court's decision in *Preiser v. Rodriguez*, 411 U.S. 475 (1973), where the
Court first used the term to distinguish between prisoner claims that must
be brought via habeas, and those claims capable of enforcement through
42 U.S.C. § 1983. *See id.* at 487-88. *See generally Docken v. Chase*, 393
F.3d 1024 (9th Cir. 2004) (discussing the evolution of the habeas/§ 1983
distinction).

[6]As the Court observed, "[w]hile Padilla's detention is undeniably
unique in many respects, it is at bottom a simple challenge to physical cus-

Despite its broad ruling on the application of the immediate custodian rule, the Court expressly reserved the question whether the same is true in the context of immigration habeas petitions—*viz.*, whether *Padilla* abrogated our holding in *Armentero I*.[7] We ordered supplemental briefing on *Padilla*'s impact on our holding in *Armentero I*, and, after receiving the initial round of briefs, granted the government's then-pending petition for panel rehearing to allow full consideration of the continuing vitality of our original decision. *See* 382 F.3d 1153.

## II.  Fugitive Disentitlement

In its opening supplemental brief, the government advised this court of the facts recited above concerning Armentero's

---

tody imposed by the Executive — the traditional core of the Great Writ. . . . His detention is thus not unique in any way that would provide [an] arguable basis for a departure from the immediate custodian rule." *Padilla*, 124 S. Ct. at 2721 (citations omitted).

[7]The footnote reserving the question stated:

In *Ahrens* v. *Clark*, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), we left open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation. *Id.*, at 189, 193, 68 S.Ct. 1443. The lower courts have divided on this question, with the majority applying the immediate custodian rule and holding that the Attorney General is not a proper respondent. Compare *Robledo-Gonzales* v. *Ashcroft*, 342 F.3d 667 (C.A.7 2003) (Attorney General is not proper respondent); *Roman* v. *Ashcroft*, 340 F.3d 314 (C.A.6 2003) (same); *Vasquez* v. *Reno*, 233 F.3d 688 (C.A.1 2000) (same); *Yi* v. *Maugans*, 24 F.3d 500 (C.A.3 1994) (same), with *Armentero* v. *INS*, 340 F.3d 1058 (C.A.9 2003) (Attorney General is proper respondent). The Second Circuit discussed the question at some length, but ultimately reserved judgment in *Henderson* v. *INS*, 157 F.3d 106 (1998). Because the issue is not before us today, we again decline to resolve it.

*Padilla*, 124 S. Ct. at 2718 n.8.

absence from custody. The government made no argument, however, concerning the impact of Armentero's flight on his ability to press this appeal. To the contrary, the government argued that Armentero's fugitive status only underscored why Armentero's appeal was *not* moot,[8] *viz.*, why the court could reach the merits of *Armentero I*. Only in its supplemental reply brief, to which Armentero had no chance to respond before argument, did the government urge this court to dismiss the appeal on the basis of the "fugitive disentitlement"

---

[8]The parties agree that the case is not moot. Nevertheless, "we have an independent duty to consider *sua sponte* whether a case is moot." *Demery v. Arpaio*, 378 F.3d 1020, 1025 (9th Cir. 2004). On this issue, I find the logic of the en banc Sixth Circuit in an analogous case persuasive. In *Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir.) (en banc), *cert. denied*, 539 U.S. 941 (2003), the court concluded that a habeas petition filed by a similarly-situated detainee who had been *released* from physical custody was not moot:

> Although Rosales is not currently being detained, his immigration parole can be revoked by the INS at any time for almost any reason. Unlike parole granted following incarceration for a criminal conviction, Rosales need not do anything for the INS to revoke his parole; for instance, the INS can revoke Rosales's parole if it deems such revocation to be "in the public interest." Thus, Rosales's "release" into the United States does not constitute a termination of detention; it simply constitutes a reprieve from detention. Under these circumstances, we believe that Rosales is threatened with an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision. We therefore conclude that Rosales's appeal is not moot.

*Rosales-Garcia*, 322 F.3d at 395-96 (citation and footnotes omitted); *see also Khotesouvan v. Morones*, 386 F.3d 1298 (9th Cir. 2004) (considering the merits of habeas petitions filed by a group of petitioners even though some had been released); *Yong v. INS*, 208 F.3d 1116, 1118 n.1 (9th Cir. 2000). The Supreme Court's decision in *Martinez* alters the legal landscape for the detention of Armentero and may well foreordain the result on the merits of the issue presented should it ever be reached. Since *Martinez*, however, the government has not informed us of any change in its position on the merits of this case, which was — and remains — that it can re-detain Armentero "at any time for almost any reason." Armentero's petition is therefore not moot.

doctrine. Under this doctrine, appellate courts may, at their discretion, "dismiss an appeal or writ in a criminal matter when the party seeking relief becomes a fugitive." *Degen v. United States*, 517 U.S. 820, 823 (1996); *see also Ortega-Rodriguez v. United States*, 507 U.S. 234, 242 (1993). The government's argument, which the majority adopts, is unavailing for three separate, but equally compelling, reasons.

*First*, although we have held that the fugitive disentitlement doctrine does apply in immigration cases, *see Antonio-Martinez v. INS*, 317 F.3d 1089, 1092 (9th Cir. 2002), it is "a 'severe' sanction that we do not lightly impose," *id.* at 1091 (quoting *Degen*, 517 U.S. at 828). Courts have generally applied the doctrine only when defendants abscond from custody during trial, or before or while serving their sentence.

When a fugitive has absconded from parole or probation, we have twice declined to dismiss the appeal. *See United States v. Gonzalez*, 300 F.3d 1048, 1051 (9th Cir. 2002); *United States v. Van Cauwenberghe*, 934 F.3d 1048, 1054-55 (9th Cir. 1991). Although neither *Gonzalez* nor *Van Cauwenberghe* are squarely on point, both cases relied on the extent to which the purposes of the doctrine are not as directly implicated when — as is arguably the case here — the appellant has not absconded from incarceration, and held that the exercise of our discretion to apply the doctrine was inappropriate.

*Second*, the issue presently before this court does not directly implicate Armentero's liberty. We are not faced with the serious and valid concern articulated by the *Antonio-Martinez* court — that the appeal has the " 'heads I win, tails you'll never find me' quality that justifies disentitlement in other contexts." 317 F.3d at 1093; *see also Sapoundjiev v. Ashcroft*, 376 F.3d 727, 729 (7th Cir. 2004). All we would be deciding for now is *who* the proper respondent is to Armentero's habeas petition; whether the case should proceed further could be decided thereafter.

More specifically: As highlighted in *Antonio-Martinez*, the Supreme Court articulated several factors in *Degen* as pertinent to deciding whether the fugitive disentitlement should be invoked:

> Some [of the factors] focus on the wrongfulness of the defendant's conduct: Disentitlement punishes those who evade the reach of the law and thus discourages recourse to flight. Others focus on the consequences of the defendant's absence: Flight frustrates the execution of judgment should the government prevail; by invoking the doctrine, we "avoid making decisions that could not be enforced."

317 F.3d at 1091-92 (quoting *Gonzalez*, 300 F.3d at 1051) (citations omitted).

Neither of these considerations are pertinent here, as long as we are considering only the proper respondent issue. Deciding that question alone would not encourage future litigants to flee, nor would our resolution of the issue be unenforceable. Additionally, any concern about judicial resources cuts the other way, given the considerable amount of time this court — and the parties and amici — have already devoted to fully briefing and arguing the proper respondent question.

Further, regardless of who the proper respondent is, the parties agree that it cannot be the INS, for the reasons we summarized in *Armentero I*. *See* 340 F.3d at 1071 & n.7. Also, the government has not (entirely) waived the proper respondent issue: The government argued in its opening supplemental brief only that "the Attorney General and the Secretary of DHS are *not* proper respondents after *Padilla*, and that no one else above the Field Office Director in DHS's organizational framework is either." While the government did purport to "waive" the precise identity of the proper respondent as long as these criteria are met,[9] what matters for the present

---

[9]Whether a failure to name a proper respondent is ever a jurisdictional defect, and therefore not subject to waiver, is a complicated question, as

is that the government *is* arguing that both the respondent named and the respondents we determined in *Armentero I* to be proper are not adequate.

There is, therefore, no way that this panel could reach the merits of Armentero's appeal at this stage of the litigation without first remanding the case to the district court to allow substitution of a proper respondent — the ultimate remedy prescribed in *Armentero I*. That is to say, even if we agreed with the government's current argument that *Padilla* controls, there would have to be a remand to allow Armentero to name his immediate custodian as his respondent.

Upon the inevitable remand to the district court, the government could then invoke fugitive disentitlement as a reason why the district court should not reach the underlying merits of Armentero's claim. At that juncture, application of the fugitive disentitlement doctrine might indeed be compelled by *Antonio-Martinez*; at the very least, it would be a closer question. We granted the petition for rehearing, however, only to consider a single procedural issue. There is no reason grounded in the purposes underlying the fugitive disentitlement doctrine for invoking our discretion to apply that doctrine before deciding the proper respondent issue.

*Finally*, even if a convincing argument existed supporting application of the fugitive disentitlement doctrine at this stage of the proceedings, the government only raised this argument in its supplemental reply brief, not at any point in its original

waiver might implicate Article III redressability concerns. *See Smith v. Idaho*, 392 F.3d 350, 355 n.3 (9th Cir. 2004). We have recognized, however, that absent such redressability concerns, the identity of the proper respondent *is* waivable. *See id*. at 355 & n.4; *see also Padilla*, 124 S. Ct. at 2728 (Kennedy, J., concurring) ("Because the immediate-custodian and territorial-jurisdiction rules are like personal jurisdiction or venue rules, objections to the filing of petitions based on those grounds can be waived by the Government.").

supplemental brief or in any of its previous filings — including the petition for rehearing, filed long after Armentero absconded.[10]

Failure to raise an argument in an opening brief constitutes waiver, *see Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003), even if the reply brief is in response to supplemental briefing ordered by the court, *see Guam v. Fejeran*, 687 F.2d 302, 304 n.1 (9th Cir. 1982).[11] It goes without saying — or at least it should — that

> All arguments for reversal must appear in the opening brief, so that the appellee may address them. We have consistently refused to consider arguments withheld until the reply brief. The [government] has not offered a reason for omitting this question from its opening brief. We find it inexplicable. Procedural rules apply to the government as well as to defendants.

*Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir. 1990) (citations omitted). As the fugitive disentitlement doctrine is discretionary, not a legal requirement, it is all the more inappropriate to reach out and decide it where, as here, it was not properly raised.

---

[10]At oral argument, the government suggested that Armentero should have been on notice with regard to the fugitive disentitlement argument because the *fact* section of its opening supplemental brief revealed that Armentero had walked away from his placement at the halfway house. The fugitive disentitlement doctrine was nowhere mentioned in the brief, however. Stating facts that could give rise to an argument is not fair notice of the argument.

[11]In limited cases, we have recognized that an argument raised in a reply brief may be considered, so long as the adverse party would suffer no prejudice from our consideration of the issue — for example, if it had briefed the issue anyway. *See Singh v. Ashcroft*, 361 F.3d 1152, 1157 n.3 (9th Cir. 2004). That is not the case here.

In short, I would not apply the fugitive disentitlement doctrine, but would proceed to decide the issue on which we granted rehearing.

## III.   Proper Respondent

That issue, reserved in *Padilla*, is "whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation." 124 S. Ct. at 2718 n.8. The lineage of this question is well-traced by our earlier decision in *Armentero I*, so I will not repeat that analysis here.

In considering the merits of the issue on which we granted rehearing, the government's curious litigation position, alluded to earlier, is critical: The government did not argue in *Armentero I* that the immediate custodian *was* the proper respondent. Rather, it argued that the proper respondent was the District Director (now the "Field Office Director") — the supervisor of the local office of the then-INS. Moreover, the government argued then, and continues to suggest now, that, so long as a detainee files his habeas petition in the district of confinement, the immediate custodian rule need not apply.[12] In such a case, the government purports to "waive" whether the proper respondent is the Field Office Director or a subordinate, so long as it is no one *superior* to the Field Office Director.

To me, this selective waiver position is untenable. If the immediate custodian rule does not apply, then it does not apply. There is no "next-immediate-custodian," or "intermediate custodian," rule that governs in the breach. Nor may the

---

[12]On rehearing, the government has advised the court that it is currently undertaking an internal review of its procedures to determine the appropriate official to name as the respondent in immigration habeas petitions, if not the immediate custodian. I fail to see how the executive branch can by regulation determine the procedural question presently before this court, as that question concerns only judicial, not administrative, proceedings.

government through a purported "waiver" dictate a respondent who was *not* named in this case. We cannot fault a petitioner for failing to name an *improper* respondent chosen by the government. Consequently, I consider this case on the premise that the government *has* waived the "immediate custodian" rule, and that we are to decide who is the proper respondent if *not* the immediate custodian.

Our holding in *Armentero I* was predicated on the conclusion that, once the immediate custodian rule does not apply, there are no reasons that counsel against naming the Attorney General and Secretary of Homeland Security — the officials who ultimately, in reality, can decide whether to keep Armentero detained — as respondents in immigration habeas petitions. I still find that general conclusion persuasive, although I would modify the appropriate custodian in Mariel Cuban cases, for reasons that will appear.

### A.   The Immediate Custodian Rule

*Padilla* traced the immediate custodian rule directly to the Supreme Court's decision in *Wales v. Whitney*, in which the Court concluded that the federal habeas statute "contemplate[s] a proceeding against some person who has the immediate custody of the party detained, with the power to produce the body of such party before the court or judge, that he may be liberated if no sufficient reason is shown to the contrary." 114 U.S. at 574. To the extent that the rule has a statutory foundation, that foundation is one sentence in 28 U.S.C. § 2243, which provides that "[t]he writ, or order to show cause shall be directed to the person having custody of the person detained."

Traditionally, a petition for a writ of habeas corpus "ad subjiciendum" proceeded in much the same way as a petition for a writ of certiorari proceeds today: Granting the petition was not dispositive of the merits; instead, the writ would issue for good cause shown, to *allow* the court to inquire into the

basis for the prisoner's confinement. *See* 3 William Black-stone, Commentaries *129-31; *Sabino v. Reno*, 8 F. Supp. 2d 622, 627 (S.D. Tex. 1998). As one district court recently summarized,

> We often think of habeas corpus as the remedy the prisoner seeks, i.e., that if the prisoner is entitled to relief, the court will issue a writ of habeas corpus, which will end his imprisonment. But as the older statutes show, the writ of habeas corpus merely initiates the proceedings. It is analogous in this respect to the writ of certiorari, another prerogative writ still in use. When the Supreme Court grants a writ of certiorari, it is bringing the case before it for decision rather than deciding it on the merits. The same is true in the case of habeas corpus.

*Roman v. Ashcroft*, 162 F. Supp. 2d 755, 759 (N.D. Ohio 2001).

At the time of *Wales*, then, directing the writ to the immediate custodian was a practical necessity. It was the immediate custodian who was best suited physically to bring the prisoner before the court, regardless of his authority to effectuate the prisoner's *release*.

This understanding prevailed until 1941, when the Supreme Court, in *Walker v. Johnston*, 312 U.S. 275 (1941), unanimously approved the growing practice of conducting show-cause proceedings before issuing the writ.[13] Between them, the petition and the respondent's "traverse,"[14] the Court con-

---

[13]The Court had implicitly sanctioned such show-cause procedures as far back as 1830, *see Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 196 (1830), but did not explicitly uphold its universal validity until *Walker*.

[14]A traverse is a common-law pleading that constitutes "[a] formal denial of a factual allegation made in the opposing party's pleading." Black's Law Dictionary 1538 (8th ed. 2004).

cluded, would be sufficient to determine the viability of issuance of the writ, unless factual issues were in dispute, and an evidentiary hearing was therefore necessary. *See id.* at 284. Under that procedure, if the petition is granted and the writ issues, the petitioner can be set free without ever coming into the courtroom.

Although courts embraced *Walker* slowly at first, it has since become standard practice in the federal courts, to the point that most federal habeas petitions today are adjudicated without formal production of the "body."[15] As *Roman* summarized,

> As a result of the courts' approval of show cause orders in lieu of the writ, and of the rule of *Walker*, now codified in § 2243, actual production of the petitioner's body in court is necessary only in those cases in which (1) the court does not dismiss the petition *sua sponte* on the ground that it is facially insufficient; (2) the court issues the writ rather than a show cause order, or the court determines, after considering the return to the show cause order, that a hearing is necessary; and (3) the petition, together with the answer, presents issues of fact. This is a vanishingly small category of cases.

162 F. Supp. 2d at 760.

It seems, then, that the immediate custodian rule, at least as enunciated in *Wales*, is based on what is today a legal anachronism: that the petitioner is actually to be brought before the court. In the pre-*Walker* context, concerns over the power of the jailer to bring the body before the court were necessarily

---

[15]For an academic version of this argument, and its implications, see Megan A. Ferstenfield-Torres, *Who Are We To Name? The Applicability of the "Immediate-Custodian-as-Respondent" Rule to Habeas Claims Under 28 U.S.C. § 2241*, 17 Geo. Immigr. L.J. 431, 461-63 (2003).

paramount. Today, however, the more central question raised in a habeas petition is whether the respondent has the authority to effectuate the petitioner's release.[16] *See, e.g.*, *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) (analyzing whether jurisdiction existed over a habeas petition brought by a U.S. citizen detained by the Saudi Arabian government by focusing on the power of the respondent to provide the requested relief). This historical context explains why the immediate custodian is not an inflexible, jurisdictional mandate, but instead is subject to exceptions based on practical considerations. *See, e.g.*, *Padilla*, 124 S. Ct. at 2728-29 (Kennedy, J., concurring). The question we face is which such considerations predominate here, in light of the government's "intermediate custodian" position.

## B. *Padilla* and the REAL ID Act of 2005

The primary consideration cutting against the universal application of the immediate custodian rule to immigration-related habeas petitions when we decided *Armentero I*, and at the time the Supreme Court handed down *Padilla*, was the fact that, at those times, many habeas petitions "filed by an alien detained pending deportation" did not concern aliens who were detained. *See Armentero I*, 340 F.3d at 1060 n.2 (noting that "non-detainees under INS control, such as those under an order of deportation or removal, may also file habeas petitions"). Instead, most immigration habeas petitions were challenges to final orders of removal.[17] In such cases, in my

---

[16]For example, upon a district court's grant of a habeas petition, presumably the immediate custodian must first contact his superiors to ascertain whether the decision will be appealed before he may release the prisoner.

[17]Of the six circuit cases cited in *Padilla*'s footnote 8 — where the Court reserved the application of the immediate custodian rule to immigration habeas petitions — the other five were challenges to removal/deportation orders and not to present physical confinement. *See Robledo-Gonzales v. Ashcroft*, 342 F.3d 667 (7th Cir. 2003); *Roman v. Ashcroft*, 340 F.3d 314 (6th Cir. 2003); *Vasquez v. Reno*, 233 F.3d 688 (1st Cir. 2000); *Henderson v. INS*, 157 F.3d 106 (2d Cir. 1998); *Yi v. Maugans*, 24 F.3d 500 (3d Cir. 1994).

view, under *Padilla*'s analysis of the immediate custodian rule, that rule would not have applied. *See, e.g.*, 124 S. Ct. at 2719 ("[T]he immediate physical custodian rule, by its terms, does not apply when a habeas petitioner challenges something other than his present physical confinement."). Several district courts have so decided since *Padilla*. *See, e.g.*, *Somir v. United States*, 354 F. Supp. 2d 215, 216-18 & n.1 (E.D.N.Y. 2005) (holding that *Padilla* does not apply to a petition challenging a removal order, not challenging "present physical confinement"); *Campbell v. Ganter*, 353 F. Supp. 2d 332, 336-38 (E.D.N.Y. 2004) (same).

With the passage of the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, however, immigration habeas petitions challenging "something other than . . . present physical confinement" have been largely, if not entirely, eliminated. The Act creates new 8 U.S.C. § 1252(a)(5), which provides that:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act, except as provided in subsection (e).

*Id*. § 106(a)(1)(B), 119 Stat. at 310. The Conference Report on the REAL ID Act states that "section 106 would not preclude habeas review over challenges to detention that are independent of challenges to removal orders. Instead, the bill would eliminate habeas review only over challenges to removal orders." H.R. CONF. REP. NO. 109-72, at 175 (2005).[18]

---

[18]Whether, and to what degree, such a foreclosure of the writ may implicate the Suspension Clause, U.S. CONST. art. I, § 9, cl. 2; *see INS v. St. Cyr*, 533 U.S. 289 (2001), is not an issue in this case, and therefore one upon which I express no opinion.

As the new statute is apparently intended to eliminate the class of immigration habeas petitions concerning challenges to removal orders, I consider the present petition on its own facts.

This case *does* concern the propriety of physical confinement.[19] Yet, although this case may initially appear close enough to the "core challenges" category described by the *Padilla* Court that the principles governing the proper respondent should be the same, the government is not willing to embrace that position, presumably because immigration detainees are kept in a wide range of facilities, including some as to which BICE exercises little day-to-day control. *See Armentero I*, 340 F.3d at 1068-69. I conclude that the government's proposed respondent, the Field Office Director, is not proper, at least in Mariel Cuban cases.

### C.  Mariel Cubans

Like the litigants in many of the recent indefinite immigration detention cases, Armentero is a Mariel Cuban — a Cuban national who was part of the Mariel Boatlift of 1980. Critical to my conclusion is that Mariel Cubans, unlike other classes of immigrants subject to potentially indefinite detention, are covered by a specific regulation adopted in 1987 (the "Cuban Review Plan," 8 C.F.R. § 212.12) governing their detention and eligibility for parole.[20] A "Cuban Review Panel"[21] is

---

[19]The crux of Armentero's case, on the merits, is whether his potentially indefinite detention is unlawful. That issue, seemingly, has been resolved in his favor by *Clark v. Martinez*, 125 S. Ct. 716 (2005), in which the Supreme Court extended its holding barring indefinite detention of admissible aliens in *Zadvydas v. Davis*, 533 U.S. 678 (2001), to inadmissible aliens. *See Martinez*, 125 S. Ct. at 722-27. Whether *Martinez* does, as appears, foreordain the result in this case is a separate question, and one that I would not reach at this stage, given that we must, on my view of the case, remand to the district court in any event.

[20]In rejecting the argument that 8 U.S.C. § 1231(a)(6) may be read as authorizing the indefinite detention of inadmissible aliens such as the Mar-

responsible for periodic review of each detainee's suitability for parole. If the panel finds the detainee suitable for parole, it so recommends to the Associate Commissioner for Enforcement, who then decides whether to exercise his discretion to release the detainee. *See* 8 C.F.R. § 212.12(d)(4)(iii). The ultimate decision is up to the Associate Commissioner for Enforcement, director of BICE's Office of Enforcement in Washington, D.C. *See id.* § 100.2(c)(2).

Under the regulations, once paroled, a detainee may generally be re-detained only at the discretion of the Associate Commissioner. Specifically, "[t]he Associate Commissioner for Enforcement shall have authority, in the exercise of discretion, to revoke parole in respect to Mariel Cubans. A district director may also revoke parole when, in the district director's opinion, revocation is in the public interest *and* circumstances do not reasonably permit referral of the case to the Associate Commissioner." *Id.* § 212.12(h) (emphasis added). Importantly, just as the decision to parole a Mariel

iel Cubans, the Supreme Court in *Martinez* presumably rendered the regulations I discuss obsolete. In the five months since *Martinez*, however, no administrative action to revise the Cuban Review Plan has been proposed by the government. I therefore proceed on the assumption that these regulations remain in force in practice, as well as in theory.

[21]The "Cuban Review Panel" is an ad hoc body formed on a case-by-case basis from the staff of the Bureau of Immigration and Customs Enforcement (BICE) by the "Director of the Cuban Review Plan," an official appointed by the Associate Commissioner for Enforcement. *See* 8 C.F.R. § 212.12(c). As § 212.12(d)(1) provides,

> A Cuban Review Panel shall, except as otherwise provided, consist of two persons. Members of a Review Panel shall be selected from the professional staff of the Service. All recommendations by a two-member Panel shall be unanimous. If the vote of a two-member Panel is split, it shall adjourn its deliberations concerning that particular detainee until a third Panel member is added. A recommendation by a three-member Panel shall be by majority vote. The third member of any Panel shall be the Director of the Cuban Review Plan or his designee.

Cuban is generally the purview of the Associate Commissioner (based on the recommendation of the Cuban Review Panel), *see id*. § 212.12(b), (d), so too the decision to revoke parole is also generally that official's responsibility. The district director is only empowered to act when "circumstances do not reasonably permit referral of the case to the Associate Commissioner."

In my view, the significance of these regulations is that the government has decided that oversight authority over the detention of Mariel Cubans is specifically *not* the purview of local officials, except in extraordinary circumstances. Were a local official — be it the warden of the jail or the district director — to release Armentero from custody,[22] the official would be violating federal regulations by so doing. In this circumstance, a habeas petition naming the immediate custodian *or* the Field Office Director would be naming a respondent incapable of providing the requested relief.

At least in the case of the Mariel Cubans, then, BICE's internal regulations concerning authority over detention and parole are inconsistent with its invocation of *Padilla* to require the naming of a local official even if the immediate custodian is *not* the respondent. The most junior official who can release Armentero is the Associate Commissioner for Enforcement.[23] For these reasons, I would not apply BICE's version of an "intermediate" custodian rule to the Mariel Cubans.

---

[22]Courts have traditionally not adhered to the immediate custodian rule in habeas petitions challenging parole determinations. *See, e.g.*, *Billiteri v. U.S. Bd. of Parole*, 541 F.2d 938 (2d Cir. 1976).

[23]Consequently, whether the Associate Commissioner is a more suitable respondent than the Attorney General or the Secretary of Homeland Security is a question I do not here reach. The government is not arguing that *any* of these officials is a proper respondent, the majority does not address the question, and the parties have not addressed the significance of the Mariel Cuban regulations.

### D.   Forum-Shopping Concerns

One last point deserves mention: The government, in arguing against our opinion in *Armentero I*, suggests that the principle there adopted would allow similarly situated petitioners to forum-shop from among any courts with personal jurisdiction over the Attorney General and the Secretary of Homeland Security — presumably, all ninety-four district courts. Yet, the government's post-*Padilla* satisfaction with an "intermediate" custodian suggests that its ultimate concern is not, as it suggests, the identity of the official the detainee sues, but the forum in which the detainee sues them. So conceived, the government's custodian rule becomes nothing but an indirect — but effective — means by which the government can generally require habeas petitions to be brought in the district of confinement.

As the Supreme Court emphasized over thirty years ago, venue principles provide adequate assurance against forum-shopping by habeas petitioners. *See Braden v. Thirtieth Judicial Circuit Court of Ky.*, 410 U.S. 484 (1973). *Braden* rejected *Ahrens v. Clark*, 335 U.S. 188 (1948), in which the Court had held that, absent special circumstances, habeas petitions should generally be filed in the district of confinement.[24] Noting that traditional considerations of venue would alleviate any forum-based abuse of the writ and that there is no constitutional basis for the district-of-confinement rule, *Braden* concluded that a district court need only have personal jurisdiction over the respondent named in a habeas petition.

*Padilla* left *Braden* intact, at least in these respects. Justice Kennedy so acknowledged in his concurrence for himself and Justice O'Connor. *See Padilla*, 124 S. Ct. at 2728-29 (Kennedy, J., concurring).[25] Additionally, the Court so acknowl-

---

[24]*Braden* reached this result by disagreeing with *Ahrens* over the meaning of the "within their respective jurisdictions" language in 28 U.S.C. § 2241(a). *See* 410 U.S. at 495-500.

[25]As Justice Kennedy's and Justice O'Connor's votes were essential to the result reached by the majority, their view of the scope of the majority's

edged in another case decided on the same day, *see Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004) ("No party questions the District Court's jurisdiction over petitioners' custodians. Section 2241, by its terms, requires nothing more." (citing *Braden*, 410 U.S. at 495)); *see also Padilla*, 124 S. Ct. at 2721 ("We have interpreted [§ 2241] to require 'nothing more than that the court issuing the writ have jurisdiction over the custodian.' " (citing *Braden*, 410 U.S. at 495)). True, *Padilla* and *Rasul* do appear at points to be in some tension with regard to the interaction between *Braden* and the appropriate custodian rule. Still, reading *Padilla* and *Rasul* together, I conclude that *Braden* continues to stand for the propositions that the district-of-confinement requirement enunciated in *Ahrens* is no longer an appropriate reading of 28 U.S.C. § 2241, at least where the immediate custodian is not the respondent. Instead, venue is the appropriate mechanism to prevent forum-shopping by petitioners. Consequently, *Braden* remains an obstacle to the contention that venue considerations are insufficient to avoid forum-shopping by petitioners.

In light of this discussion, then, I see no reason why the district of confinement should have any bearing on the identity of the respondent. Put another way, I do not read *Padilla* as sanctioning the use of the intermediate custodian rule championed by the government as a means of restoring *Ahrens*'s district-of-confinement rule through the back door.[26] Unless

---

rule is entitled to particular weight. *See, e.g., Schmitz v. Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994) ("Because three other justices dissented [in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968)], the vote of either Justice White or Justice Marshall was necessary to the formation of a majority voting for reversal. Justice White's concurrence has therefore been given particular weight." (citing *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1200 (11th Cir. 1982))).

[26]As *Padilla* recognized, the immediate custodian rule follows from the language of § 2243, which identifies the immediate custodian as the party to whom the writ of habeas corpus should ordinarily be directed. Section 2243, however, says *nothing* about any district-of-confinement rule.

*Padilla requires* us to apply the immediate custodian rule — and, for the reasons discussed above, I conclude that it does not in this case, as the rule is not jurisdictional — there is no *other* independent reason to require a petitioner such as Armentero to name his immediate (or intermediate) custodian as respondent.

Moreover, just as petitioners should not be permitted to forum-shop, the government should not be allowed to forum-shop either. Yet adherence to BICE's "intermediate custodian" rule would accomplish just that. By choosing the district of confinement, the government could fix the forum for a detainee's habeas claim, as well as overwhelm particular district courts. *See Armentero I*, 340 F.3d at 1069-70.

## IV.   Conclusion

Regardless of how I would resolve the proper respondent issue, which *is* a close call on the unique facts of this case, dismissing Armentero's appeal under the guise of the discretionary fugitive disentitlement doctrine is not necessary, appropriate, or prudent. I therefore respectfully dissent.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2005 Thomson/West.